## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **J.W., by her next friend and parent,** | : |
| **JORIE WIMBISH,** | : |
| **110 Euclid St., N.W.,** | : |
| **Washington, D.C. 20009** | : |
| | : |
| **Plaintiffs,** | : |
| | : |
| **v.** | : |
| | : |
| **DISTRICT OF COLUMBIA,** | : |
| **A Municipal Corporation** | : |
| **One Judicial Square** | : |
| **441 Fourth Street, N.W.** | : |
| **Washington, D.C. 20001** | : |
| | : |
| **to serve:** | : |
| | : |
| **MURIEL BOWSER, MAYOR** | : |
| **District of Columbia** | : |
| **441 4th St. N.W., 11th Fl.** | : |
| **Washington, D.C. 20002** | :    **Civ. A. No:** |
| | : |
| **KARL A. RACINE** | : |
| **ATTORNEY GENERAL** | : |
| **District of Columbia** | : |
| **441 4th Street, N.W., 11th Fl.** | : |
| **Washington, D.C. 20002** | : |
| | : |
| **Defendant.** | : |

## COMPLAINT

COME NOW the Plaintiffs, by and through their attorneys, Carolyn Houck, Esq., Stevie Nabors, Esq. and Charles Moran, Esq., to respectfully request this Court issue an injunction ordering the District of Columbia to maintain the child's then-current educational placement pursuant to the Individuals with Disabilities Education Improvement Act's ("IDEA") stay put provision. The Plaintiffs plead as follows:

<u>JURISDICTION</u>

1.  This Court has jurisdiction pursuant to the Individuals with Disabilities Education
    Improvement Act, 20 U.S.C §§ 1400-1461 (West 2004), as amended in 2004, 28 U.S.C.
    § 1331, 42 U.S.C. § 1983, and 5 D.C.M.R. § 3000.1 et seq. (West 2013). This Court also
    has supplemental jurisdiction pursuant to 28 U.S.C § 1367.

2.  Declaratory relief is authorized by 28 U.S.C §§ 2201, 2202.

3.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

<u>PARTIES</u>

4.  Plaintiff Jorie Wimbish ("Ms. Wimbish") is the mother and legal guardian of J.W.,[1] a
    minor student with disabilities who was previously identified as eligible for special
    education and related services under the IDEA by the District of Columbia Public
    School System ("DCPS").

5.  J.W. is fourteen (14) years old.

6.  J.W. resides in the District of Columbia with her mother.

7.  Defendant, the District of Columbia Government, is a municipal corporation that receives
    federal funds pursuant to the IDEA, to ensure access to a free and appropriate education
    ("FAPE") to all children until twenty-one years of age under federal law and twenty-two
    years of age under the local law, and is obligated to comply with the applicable federal
    regulations and statutes including but not limited to the IDEA. The District of Columbia
    Public Schools ("DCPS") and the Office of the State Superintendent for Education
    ("OSSE") are *non sui juris* of the District of Columbia.

<u>FACTUAL BACKGROUND</u>

1.  J.W. currently attends Stuart Hall School a non-public parochial boarding school located

---

[1]  Pursuant to LCvR 5.4(f)(2), K.P is only mentioned by her initials.

in Staunton, Virginia.  This placement is being funded, in part, by DCPS, pursuant to a March 29, 2015 Hearing Officer's Determination.

2. From 2008 through June 2014, DCPS funded J.W.'s placement at Kingsbury Day School, a full-time-special education day school.  She was classified as Other Health Impaired ("OHI").

3. During the 2013-14 school year, the parent and DCPS agreed that Kingsbury was too restrictive a placement for J.W. and that she needed to transition to a less-restrictive environment.

4. Early in the 2013-14 school year, DCPS proposed transitioning J.W. to a public placement.  The mother accepted this and cooperated fully, even to the extent of allowing J.W. to transition to the public placement at Columbia Heights Educational Center, beginning in October 2013.  It was clear early on that the placement was not appropriate. DCPS agreed fully with the parent that this placement only caused J.W.'s anxiety to worsen, that she was making no progress academically, and that the transition was not successful.  After approximately two months, DCPS informed the parent that it had no other placement to offer and placed J.W. back at Kingsbury.

5. The DCPS monitor for Kingsbury (and all other members of the DCPS team and Kingsbury staff) fully encouraged Ms. Wimbish to seek a private placement, as DCPS did not have an appropriate placement for J.W. At no time did anyone at DCPS suggest a possible DCPS placement, including placing J.W. at her neighborhood school, Cardozo Educational Campus.  Instead, DCPS told Ms. Wimbish that J.W.'s neighborhood school would not be appropriate for her.

6. With DCPS' ongoing encouragement, Ms. Wimbish searched for appropriate placements for her daughter.  Ms. Wimbish was assiduous in her efforts to keep DCPS informed about any potential placements. She had multiple conversations with DCPS during this period and was actively encouraged by DCPS employees to keep up the search until she found an appropriate placement for J.W.

7. DCPS developed an IEP on May 1, 2014.  The IEP states that J.W. experiences anxiety, causing behaviors that are disruptive to her school day, including impeding her communication process.  In addition, she has difficulty maintaining attention and completing assignments.

8. The IEP further states that J.W.'s "weakness in language processing requires specialized instruction in a small class setting in an out-of-general education school with related services integrated into the instruction…has moderate deficits in the areas of phonemic awareness and written language…difficulties in emotional regulation, and rigidity in social problem solving requires significant social-emotional support to help properly navigate the academic environment as related to work and relationships."

9. Due to Ms. Wimbish's efforts, J.W. was accepted at Stuart Hall, a private parochial school in Staunton, Virginia.  J.W. received a financial aid package that required the mother to pay only a portion of the tuition. Given that situation, the amount that DCPS would need to pay for its inappropriate placement at Kingsbury was well over four times the amount the mother would pay to Stuart Hall.

10. Nonetheless, DCPS refused. Despite the facts that DCPS admitted that Kingsbury was inappropriate and that it would cost more than four times as much as Stuart Hall, DCPS refused to offer any other placement.

11. In June 2014, Ms. Wimbish sent a letter to D.C. Council members regarding the egregious waste of taxpayer dollars in this matter, calling it "fraud, waste, and abuse" for DCPS to be willing to pay approximately $48,000 for an admittedly-inappropriate private school, as opposed to $12,000 for a school that the mother found appropriate (and, in the end, was determined by a hearing officer to be appropriate).

12. The parent became increasingly concerned about J.W.'s deteriorating anxiety disorder and inability to focus.  Due to the fact that DCPS had not evaluated J.W. since approximately 2007, the mother asked DCPS to perform a comprehensive psychological evaluation on J.W., as part of a triennial evaluation.  DCPS refused to perform the evaluation and told the mother she needed to obtain any evaluations on her own.

13. The mother contacted Children's Hospital, whose psychologists performed a neuropsychological evaluation in November 2014.

14. The evaluation report confirms J.W.'s previous diagnosis of Attention-Deficit/Hyperactivity Disorder, Combined Presentation (ADHD; DSM5 314.01), with associated executive function deficit. J.W. also exhibited mild weaknesses in reading and writing.  Additionally, J.W. demonstrated significant difficulties in emotional regulation, as well as notable reported anxiety, and observed performance anxiety.  However, on account of her notable defensiveness during clinical interview and on symptom rating scales, the evaluator did not specify the exact nature or severity of this anxiety.  As such, J.W. was diagnosed with Unspecified Anxiety Disorder (DSM5 300.0), "with further specification to come from a treating mental health professional (e.g. psychiatrist, psychologist, etc.) who may more appropriately classify J.W.'s symptom patterns, duration, and severity."

15. The report further states, "J.W.'s neuropsychological profile puts her at significant risk for difficulties in academic, social, and emotional functioning. Most significantly, her difficulties with executive function, especially inhibitory control, inflexibility, and emotional regulation present as primary obstacles to learning and being able to demonstrate what she knows. J.W.'s inflexibility puts her at risk for "getting stuck" and having difficulty flexibly shifting between tasks or problem solving strategies. Furthermore, her low frustration tolerance associated with inflexibility may put her at risk for seeming oppositional when stuck, due to inefficient coping and executive control skills. J.W.'s variable attention, and the significant amount of effort it requires for her to attend, put her at risk for missing significant chunks of information in the classroom, due to an inability to sustain this level of performance even with the benefit of her stimulant medication. Likewise, her difficulties with working memory make it difficult for her to manage multi-step operations/instructions, which may in turn increase frustration. Adolescents with working memory difficulties commonly struggle in applied academic skills such as reading comprehension or multi-step mathematical computations, while organizational weaknesses put her at risk for difficulty effectively putting her thoughts into writing in an efficient and organized manner. Additionally, although her memory is strong, J.W. is at risk for difficulty showing what she knows on account of her organizational difficulties and increased frustration/anxiety when she feels she is not doing well. Overall, anxiety presents as a significant risk to her ability to function at her optimal level, as anxiety exacerbates pre-existing difficulties with attention and executive control, and may limit her receptiveness in other domains as well. Finally, J.W. is also at risk for social difficulties, as adolescents with ADHD and anxiety frequently struggle to manage

complex social information, may fail to attend to important nonverbal social cues, and

may impulsively speak or act in ways that are off-putting to peers. As such, J.W. is at risk

for both social and academic withdrawal or underachievement if her emotional regulation

difficulties/anxiety are not appropriately addressed."

16. The psychologist made many recommendations for school and home, including Cognitive

    Behavior Therapy and specific recommendations for school placement.

17. J.W. began attending Stuart Hall in August 2014.  The placement conforms to the

    recommendations in the independent neuropsychological evaluation report.

18. The mother and the school felt that Kingsbury had not appropriately prepared J.W. for the

    ninth grade, so she repeated the eighth grade.

19. J.W. made excellent academic and social progress during the school year.

20. However, the mother agrees that J.W. still requires intensive therapy for her anxiety

    issues.

21. On January 6, 2015, Ms. Wimbish filed an administrative due process complaint

    challenging, *inter alia*, DCPS' failure to develop an appropriate IEP and propose an

    appropriate placement for the 2014-15 school year.

22. On March 29, 2015, a hearing officer issued an HOD finding in favor of Ms. Wimbish.

    The hearing officer found that DCPS "denied [J.W.] a FAPE for the 2014-2015 school

    year." (HOD at 16.) The hearing officer also found that "[Mrs. Wimbish's] selection of

    [Stuart Hall] was proper under the [IDEA]." The hearing officer then ordered DCPS fund

    "50% of [Mrs. Wimbish's] obligation to pay for [J.W.]'s placement at [Stuart Hall] for the

    2014-15 school year.

23. In July 2015, Ms. Kali McFarland, a DCPS case manager emailed the parent in an effort to convene an MDT meeting.  The stated purpose of the meeting was to update the IEP and provide a school placement for school year 2015/16.

24. On July 22, 2015, the parent signed a release authorizing DCPS to obtain school records. In addition, the parent provided DCPS with J.W.'s report cards and progress reports for school year 2014/15.

25. The parties agreed to meet on August 18, 2015, and Ms. McFarland promised to provide the draft IEP by Monday, August 10, 2015.

26. Ms. McFarland did not provide the draft IEP, but the parent still agreed to meet on August 18, as planned.

27. To the parent's surprise, instead of convening a meeting to review and revise the IEP, DCPS had turned the meeting into an eligibility meeting.  First, DCPS provided a written review of the November 2014 neuropsychological evaluation, which Ms. McFarland stated had not been reviewed (despite the fact that the report was reviewed extensively at the due process hearing and that the hearing officer based his decision that Stuart Hall is an appropriate placement on the recommendations in the report).

28. The DCPS reviewer wrote, in part,

> The neuropsychological report does not contain any classroom observations, teacher or staff interviews, and/or behavior ratings from teachers and staff. This information would be prudent to include in order to determine continued eligibility under the disability classification of Other Health Impairment for ADHD . . . there is not information included in the neuropsychological report about the educational impact of J.W.'s disability of ADHD. There are multiple mentions of J.W.'s neuropsychological profile putting her at risk for difficulties in the school setting, but there is not data included to summarize how her difficulties manifest in the school setting…it will be best practice to gather additional information in the form of classroom observations, teachers/staff interviews, interventions provided in the current school setting, J.W.'s response to interventions provided, behavior

ratings from teachers/staff, as well as the academic impact of J.W.'s disability of ADHD via school data and teacher input."

29. Ms. McFarland then announced DCPS' decision to exit J.W. from special education (after a brief polling of the DCPS team members, who simply stated their agreement).

30. DCPS then summoned DCPS §504 plan developer who was waiting to be called into the meeting. Though DCPS alleged that it had not decided to terminate J.W.'s eligibility prior to the meeting, the fact that it had §504 specialist ready and waiting to draft a 504 plan for J.W. suggests that DCPS had planned in advance to exit J.W. from special education.

31. At no time did DCPS offer to perform the evaluations and collect the data necessary to make an informed decision prior to exiting J.W. from all special education.

32. After this decision was announced, Ms. McFarland then proceeded to move on to the "next part of the meeting, which is to develop a 504 Plan." The parent objected, as she had no prior notice that DCPS would be exiting her daughter from special education and developing a 504 Plan, so she was not at all prepared.

33. The parent was completely blindsided by DCPS' unilateral decision to turn what had for more than a month been planned as a meeting to develop an IEP into a meeting to determine eligibility and exit the student from special education.

34. Ms. McFarland told the parent that there is no difference between an IEP and a 504 Plan, except the "specialized instruction." The parent objected to this statement and to DCPS not developing an IEP. Ms. McFarland confirmed that DCPS' decision was final.

35. As the parent was not prepared to participate in a 504 Plan meeting, she asked that the meeting be adjourned and left.

36. On August 20, 2015, the parent filed a due process complaint alleging that DCPS had (1) failed to evaluate the student prior to exiting her from special education; (2) failed to

provide a prior written notice prior to changing the student's eligibility; (3) failed to have an IEP in place prior to the beginning of the school year; (4) failed to provide an appropriate placement prior to the beginning of school year 2015/16, including failing to involve the parents in the placement decision; and (5) retaliated against the parent for exercising her rights to litigate claims through a due process hearing and for contacting the City Council complaining of DCPS' "fraud, wasted, and abuse."

37. On August 20, 2015, Petitioner's counsel Steve Nabors, Esq. emailed Tanya Chor, Esq. asking her to confirm that DCPS will maintain J.W.'s current placement at Stuart Hall during the pendency of the proceedings.  Ms. Chor replied the same day, stating that DCPS would not continue J.W.'s placement at Stuart Hall, stating erroneously that Kingsbury Day School was the "last agreed-upon placement."

## Relevant Law
### IDEA

65.   Once a due process complaint is filed, the IDEA provides that "during the pendency of any proceedings conducted pursuant to this section . . . the child shall remain in the then-current educational placement of the child . . . until all such proceedings have been completed." 20 U.S.C. § 1415(j).

66.   The IDEA's stay put provision has been interpreted as an automatic injunction, akin to the stay in bankruptcy proceedings. *Douglas v. D.C.*, No. CV 13-1758 (PLF), 2013 WL 6021477 at *1 (D.D.C. Nov. 14, 2013).

67.   Given the automatic nature of the stay-put provision, the Plaintiffs need only show that "(1) proceedings under the IDEA are pending; and (2) prevention of a change in the "then-current educational placement" of the child is sought." *Eley v. D.C.*, No. CV 14-319(BAH)(JMF), 2014 WL 2507937, at *4 (D.D.C. June 4, 2014).

68.     As the stay-put provision imposes an automatic statutory injunction, the traditional four-part test for an injunction does not apply. *D.K. ex rel. Klein v. District of Columbia*, 2013 WL 4518207 (D.D.C. 2013); *Alston v. District of Columbia*, 439 F.Supp.2d 86, 91-92 (D.D.C 2006); *Casey K. ex rel. Norman K*, 400 F.3d at 511.

69.      When a child lacks a functioning IEP and attends a non-public school selected by the parents, the non-public school is the then-current educational placement for purposes of stay put if a hearing officer has found (1) the school system denied the student a FAPE and (2) the non-public school is appropriate. *District of Columbia v. Vinyard*, 901 F.Supp.2d 77, 85-86 (D.D.C. 2012); *District of Columbia v. Oliver*, 991 F.Supp.2d 209, 214-15 (D.D.C. 2013); *Eley v. District of Columbia*, 47 F.Supp.3d 1, 17 (D.D.C. 2014)

**Plaintiff's First Claim of Relief:**
**Violation of the IDEA's Stay-Put Provision**

38. In the March 29, 2015 HOD, the hearing officer specifically found that DCPS "denied [J.W.] a FAPE for the 2014-2015 school year." The hearing officer also found that "[Mrs. Wimbish's] selection of [Stuart Hall] was proper under the [IDEA]." (HOD at 18.)

129.    On August 18, 2015, DCPS informed Mrs. Wimbish that it had determined that J.W. was no longer eligible to receive special education and related services under the IDEA.

130.    As a result, DCPS eliminated the entirety of J.W.'s program.

131.    In response, Mrs. Wimbish filed a due process complaint on August 20, 2015 challenging DCPS termination of J.W.'s eligibility for special education and related services.

132.    Having filed a due process complaint, the Plaintiffs are entitled to an injunction under the IDEA's stay-put provision ordering DCPS to fund J.W.'s placement at Stuart Hall for the pendency of all administrative and judicial proceedings.

WHEREFORE, the Plaintiff prays that this Court:

1. Grant the Plaintiffs' accompanying motion for preliminary injunction and order the District to fund all costs of J.W.'s placement at Stuart Hall for the pendency of all administrative and judicial proceedings.

2. Award Plaintiff's attorney fees and costs of this action; and

3. Award any other relief that the Court deems just and proper.

Respectfully submitted,

_____/s/_____
Carolyn Houck [459746]
24035 Porters Creek Lane
St. Michaels, MD 21663
(301) 951-4278
cwhouck1@gmail.com

Stevie Nabors [1016291]
1220 L St NW, STE 760
Washington, D.C. 20005
(202) 742-2056
steve.nabors@camoranlaw.com

September 1, 2015